RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHERYL L. WALLACE,

*Plaintiff-Appellee*,

*v.*

OAKWOOD HEALTHCARE, INC., et al.,

*Defendants*,

RELIANCE STANDARD LIFE INSURANCE COMPANY,

*Defendant-Appellant*.

No. 18-2316

---

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:16-cv-10625—Linda V. Parker, District Judge.

Argued: October 23, 2019

Decided and Filed: March 31, 2020

Before: CLAY, THAPAR, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Joshua Bachrach, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, Chicago, Illinois, for Appellant. John J. Conway, III, JOHN J. CONWAY, P.C., Royal Oak, Michigan, for Appellee. **ON BRIEF:** Joshua Bachrach, Edna S. Kersting, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, Chicago, Illinois, for Appellant. John J. Conway, III, JOHN J. CONWAY, P.C., Royal Oak, Michigan, for Appellee.

CLAY, J., delivered the opinion of the court in which THAPAR and NALBANDIAN, JJ., joined. THAPAR, J. (pp. 25–26), delivered a separate concurring opinion.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiff Cheryl L. Wallace filed suit against Beaumont Healthcare Employee Welfare Benefit Plan, formerly known as Oakwood Healthcare, Inc. Employee Welfare Benefit Plan; Hartford Life and Accident Insurance Company; and Reliance Standard Life Insurance Company under the Employee Retirement Income Security Act of 1974, § 502(a)(1)(b), codified at 29 U.S.C. § 1132(a)(1)(B), after she was denied long-term disability benefits under her employer's employee welfare benefit plan.  Defendants Beaumont Healthcare Employee Welfare Benefit Plan and Hartford Life Insurance Company were subsequently dismissed, and the action proceeded against the only current Defendant, Reliance Standard Life Insurance Company.  The district court granted Plaintiff judgment on the administrative record. Defendant now appeals the district court's judgment.  For the reasons set forth below, we **AFFIRM IN PART** and **VACATE IN PART** the district court's judgment, and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

**Factual Background**

Plaintiff worked as a registered nurse at Oakwood Healthcare, Inc. Health System ("Oakwood") starting in 2005.[1]  As an Oakwood employee, Plaintiff participated in Oakwood's employee welfare benefit plan, the Oakwood Healthcare, Inc. Employee Welfare Benefit Plan, which provided long-term disability ("LTD") benefits to eligible employees.  This plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

This dispute began when Plaintiff's employer decided to switch the insurer responsible for its employee welfare benefit plan.  The plan was funded and insured by Hartford Life and Accident Insurance Company ("Hartford") through December 31, 2012, when Oakwood

---

[1]Oakwood has since merged with Beaumont Health System. Oakwood and the employee welfare benefit plan are now known by the Beaumont name.  For clarity, we refer to Plaintiff's employer as Oakwood, as it was known at the time of the relevant events.  Likewise, we refer to the relevant employee welfare benefit plan as the Oakwood Healthcare, Inc. Employee Welfare Benefit Plan.

terminated its contract with Hartford.  Effective January 1, 2013, Defendant became the plan's funder and insurer.  Defendant's group policy and the document detailing that policy are subject to ERISA.  Defendant also served as the plan's claims review fiduciary under ERISA.

In September 2012, Plaintiff contracted an illness while traveling in Belize.  Plaintiff's health deteriorated thereafter.  She suffered from medical issues including hypothyroidism, multiple hormone deficiencies, hypotension, hypopituitarism, immune suppression disorder, severe joint pain, and tachycardia, an arrhythmia of the heart.  As a result, beginning in October 2012, Plaintiff took medical leave from Oakwood.  While Plaintiff was out on medical leave, Oakwood's previous contract with Hartford ended and its new contract with Defendant began.  Plaintiff returned to work on April 7, 2013, but soon had to take medical leave again, starting on May 13, 2013.[2]  Plaintiff has not returned to work since.

Plaintiff subsequently filed a claim for LTD benefits with Defendant.  Defendant investigated Plaintiff's claim and, in the process, developed the administrative record now before this Court.  After its investigation, Defendant sent Plaintiff a letter denying her benefits, citing the pre-existing condition provision of its plan document as barring her claim.  In that letter, Defendant detailed how Plaintiff could request a review of her claim and the rights she would be entitled to in that review process.  The letter informed her that "[her] failure to request a review within 180 days of [her] receipt of this letter may constitute a failure to exhaust the administrative remedies available under [ERISA], and may affect [her] ability to bring a civil action under [ERISA]."  (Admin. R., R. 42-1 at PageID #821.)  Defendant's underlying plan document did not describe either the claim review process or an exhaustion requirement.

Following receipt of her denial, Plaintiff's lawyer communicated with an employee of Defendant who worked on her investigation.  Plaintiff's lawyer apparently emailed that employee regarding a note in Defendant's claims file stating that Defendant had contacted a broker to determine whether Plaintiff had filed a claim with Hartford.  The note indicated that the broker said Plaintiff had not filed a claim and it would have been denied if she had.  Plaintiff's

---

[2]Plaintiff and Defendant disagree as to whether Plaintiff's first day of leave was May 12, 2013 or May 13, 2013.  The administrative record suggests her first day of leave was May 13, 2013.  (Admin. R., R. 42-1 at PageID ##762, 798.)

lawyer suggested he was "inclined to believe your analysis that her LTD claim should be submitted to Hartford, the prior LTD carrier," (Admin. R., R. 42-3 at PageID #1094), although the evidence in the record does not demonstrate that Defendant's employee made any such suggestion.  Nevertheless, Plaintiff's counsel asked if "anyone else (other than your attorneys)" had suggested the claim should be filed with Hartford.  (*Id.*)  The employee responded that all of its documents from Hartford were included in the claims file and that "[t]here was no discussion with Reliance/Matrix attorneys during the review and decision of Ms. Wallace's claim for benefits."  (Admin. R., R. 42-1 at PageID #823.)

Plaintiff subsequently submitted a claim to Hartford, which was also denied.  She appealed that decision internally and received another denial.  Plaintiff did not submit a written request seeking review of Defendant's decision, but instead filed this lawsuit on February 19, 2016.

**Procedural Background**

Plaintiff filed suit against Defendant under ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B).  Plaintiff also originally asserted a violation of procedural due process and a claim for equitable relief and named the Oakwood Healthcare, Inc. Employee Welfare Benefit Plan and Hartford as additional defendants.  These claims and parties have since been dismissed.

Defendant moved to dismiss Plaintiff's current claim under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff failed to exhaust her administrative remedies prior to filing the lawsuit and therefore could not pursue a claim under ERISA.  The district court denied Defendant's motion as to this claim, finding that Plaintiff did not need to exhaust her administrative remedies because Defendant's plan document did not require exhaustion.

After multiple additional briefings and Defendant's filing of the administrative record, the parties filed cross-motions for judgment on that administrative record.  The district court granted Plaintiff's motion for judgment and denied Defendant's cross-motion.  The district court found that Defendant wrongly determined that Plaintiff's LTD claim was barred under its policy, as Plaintiff was covered by the policy's "Transfer of Insurance Coverage" provision, and that Plaintiff was entitled to an award of LTD benefits and attorneys' fees.  The district court

subsequently entered an opinion and order, awarding Plaintiff monthly back benefits through the present, post-judgment benefits, and attorneys' fees.

Defendant's timely notice of appeal followed.

## DISCUSSION

Defendant argues on appeal: (1) that the district court erred in determining Plaintiff was not required to exhaust her administrative remedies prior to filing suit, (2) that the district court erred in overturning Defendant's denial of LTD benefits, (3) that the district court improperly awarded and calculated benefits to Plaintiff, and (4) that the district court abused its discretion in awarding Plaintiff attorneys' fees. We address these arguments in turn.

## I.     Exhaustion of Administrative Remedies

### Standard of Review

In its decision, the district court did not simply grant Plaintiff an exception to the application of exhaustion principles, but found that exhaustion principles did not apply to Plaintiff's benefits claim. (*See* Op. & Order Granting & Den. Def.'s Mot. Dismiss, R. 36 at PageID #670 ("For these reasons, this Court concludes that Plaintiff was not required to exhaust any administrative remedies prior to filing this lawsuit").) The question of whether exhaustion principles apply to Plaintiff's benefits claim is a question of law that this Court reviews *de novo. Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 559 (6th Cir. 2017) (citing *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 248 (3d Cir. 2002); *Diaz v. United Agric. Emp. Welfare Benefit Plan & Tr.*, 50 F.3d 1478, 1483 (9th Cir. 1995) ("Because the potential applicability vel non of exhaustion principles is a question of law, we consider it de novo. But if that question receives an affirmative answer, the District Court's decision not to grant an exception to the application of those principles is reviewed for an abuse of discretion.")).

### Analysis

The district court found that Plaintiff was not required to exhaust her administrative remedies because Defendant's plan document did not affirmatively require exhaustion, but "[t]his court can affirm a decision of the district court on any grounds supported by the record,

even if different from those relied on by the district court," *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999). Defendant contends that exhaustion is required whether or not it is explicitly stated in a plan document and that none of Plaintiff's asserted reasons to excuse this requirement are availing. Plaintiff responds that: (1) exhaustion was not required because Defendant's policy does not call for it; (2) her administrative remedies should be deemed exhausted because Defendant did not comply with the ERISA requirement to establish a reasonable claims procedure; (3) she attempted to exhaust her remedies but was misled by Defendant into filing her claim with Hartford instead; and (4) appealing her decision internally would have been futile.

For the reasons set forth below, we conclude that, because Defendant did not describe any internal claims review process or remedies in its plan document, the plan did not establish a reasonable claims procedure pursuant to ERISA regulations; therefore, Plaintiff's administrative remedies must be deemed exhausted. *See* 29 C.F.R. 2560.503-1(l) (2003) (stating that if a plan fails to establish or follow claims procedures consistent with ERISA regulations, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan").

ERISA itself does not include an explicit exhaustion requirement. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004). Nevertheless, because ERISA provides for the administrative review of benefits, this Court has read such a requirement into the statute. *Hitchcock*, 851 F.3d at 560. We have recognized limited exceptions to this requirement, including where it would be futile to pursue an administrative remedy or such a remedy would be inadequate. *Id.*

ERISA regulations establish an additional exception. At the time Plaintiff filed her claim, they provided:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant *shall be deemed to have exhausted the administrative remedies available under the plan* and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. 2560.503-1(l) (2003) (emphasis added); *see also* ERISA Claims Procedure Final Rule, 65 Fed. Reg. 70,246, 70,271 (Nov. 21, 2000) (codified at 29 C.F.R. § 2650.503-1 (2003))

(adding language and indicating applicability date of January 1, 2002).**³** That same section of the ERISA regulations requires that a plan must "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(1) (2003); *see also* 29 U.S.C. § 1133 (requiring employee benefit plans to allow participants whose claims have been denied "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim"). In this case, Defendant served as that fiduciary.

Defendant maintains claims procedures and argues that it was not required to include those procedures in its plan document because it detailed those procedures in its benefits denial letter to Plaintiff. But "one of ERISA's central goals is to enable beneficiaries to learn their rights and obligations at any time," including before a denial of benefits, and Congress required plans to be "established and maintained pursuant to a written instrument" that enabled beneficiaries to determine those rights and obligations "on examining the plan documents." *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (quoting 29 U.S.C. § 1102(a)(1); and then quoting H.R. Rep. No. 93-1280, at 297 (1974)) (emphases omitted). In keeping with this intent, we hold today that for a plan fiduciary to avail itself of this Court's exhaustion requirement, its underlying plan document must—at minimum—detail its required internal appeal procedures.

This conclusion is supported by the ERISA requirement that employees be provided with a document summarizing plan details (a "summary plan description" or "SPD") that includes "[a] description of all claims procedures" and "meet[s] the requirements of 29 C.F.R. 2520.102-3." 29 C.F.R. § 2560.503-1(b)(2) (2003); *see also* 29 U.S.C. § 1022. Section 2520.102-3 in turn explicitly requires that the SPD include information on "[t]he procedures governing claims for benefits (including procedures for . . . reviewing denied claims in the case

---

**³**These regulations now go further, stating that, "In the case of a claim for disability benefits, if the plan fails to strictly adhere to all the requirements of this section with respect to a claim, the claimant is deemed to have exhausted the administrative remedies available under the plan . . . ." 29 C.F.R. § 2560.503-1(l)(2)(ii) (2018). Plaintiff wrongly relies on this language, which applies only to claims "filed under a plan after April 1, 2018." 29 C.F.R. § 2560.503-1(p)(3).

of any plan) . . . and remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 503 of Title I of the Act)." 29 C.F.R. § 2520.102-3(s) (2001); *see also* 29 U.S.C. §§ 1022(b), 1133 (detailing similar requirements).[4] Per Section 503 of ERISA, an employee benefit plan must provide participants "a reasonable opportunity" for their claim denials to receive "a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. Under the instant plan, that fiduciary is Defendant.

The SPD for the plan in question, if it exists, is not in the court record. This would be a clearer case if it was. But a summary plan description is just that: a summary of the plan. And if the SPD must include claims review procedures, surely the plan it summarizes must also include those procedures. *See* 29 U.S.C. § 1022(a) (providing that an SPD "shall be sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations *under the plan*") (emphasis added); *Electro-Mechanical Corp. v. Ogan*, 9 F.3d 445, 451 (6th Cir. 1993) (describing SPD as a document that "specifically and simply describes the plan's provisions," details "the contents of the plan," and "explains the plan and its terms") (quoting *Allen v. Atl. Richfield Ret. Plan*, 480 F. Supp. 848, 851 (E.D. Penn. 1979)).

Defendant's plan document contains no information about the review procedures or remedies available for denied claims. In fact, it is actively misleading. It mentions ERISA and claims appeals only in discussing arbitration (which Defendant does not argue was required here): "the Insured's ERISA claim appeal remedies, if applicable, must be exhausted before the claim may be submitted to arbitration." (*See* Admin. R., R. 42-1 at PageID #744.) This provision does not detail what the referenced "claim appeal remedies" are, what process is required to receive them, or when they are applicable; nor does it name a similar exhaustion requirement applicable in any circumstance outside of arbitration. In the absence of any such explanation, a participant would be justified in concluding that no such remedies are available or

---

[4]While this section also acknowledges that those claims procedures may be furnished in a separate document "that accompanies the plan's [SPD]," provided that document meets detailed requirements, *see* 29 C.F.R. § 2520.102-3(s) (2001), the only document in the record detailing Defendant's claims procedure is its benefits denial letter, which was not provided alongside any SPD.

requirements are applicable before one files a claim in federal court under ERISA, or they too would have been detailed by Defendant.

If a plan document on which an SPD is based does not include information on its claims review procedures or remedies, an SPD cannot satisfy both statutory dictates that it "sufficiently accurate[ly] and comprehensive[ly]" describe the terms of the plan and regulatory dictates that it include procedures for reviewing denied claims, remedies available for denied claims, and procedures required under Section 503. *See* 29 U.S.C. § 1022(a); 29 C.F.R. § 2520.102-3(s) (2001). This suggests that, without such information, Defendant's plan document does not abide by legal requirements, and we must deem the Plaintiff "to have exhausted the administrative remedies available under the plan." *See* 29 C.F.R. § 2560.503-1(l) (2003).

Defendant relies on *Marks v. Newcourt Credit Group*, 342 F.3d 444, 460 (6th Cir. 2003), to contend that it need only "substantially comply" with the terms of ERISA's notice requirements. But in *Marks*, we applied the substantial compliance analysis to determine only whether specific adverse determination letters were sufficient to meet ERISA notice requirements. *See id.* at 460–61. A plan document arguably should be subject to stricter requirements, as Congress established detailed requirements for what must be included in the SPDs summarizing those plans and what review rights a plan must afford a participant, beyond ERISA's basic notice requirements. *See* 29 U.S.C. §§ 1022(b), 1133. For present purposes, this Court need not decide whether a plan document must only "substantially comply" with ERISA requirements or if it must be more strictly compliant, because Defendant's plan document fails even a "substantial compliance" analysis. A plan document that does not include either the procedures for review of denied benefits claims or the remedies for such claims is wholly non-compliant.

Moreover, *Marks* is inapposite because exhaustion was not at issue there and because the language of 29 C.F.R. § 2560.503-1(l) (2003) was not yet in effect when the *Marks* defendant filed his claims. *See* 342 F.3d at 448 (indicating claims filed in June 1999). Thus, this Court did not decide in that case whether the claimant's administrative remedies should be deemed exhausted in accordance with ERISA regulations. In the case at bar, we must make such a determination, and because Defendant's plan document "fail[s] . . . to establish or follow claims

procedures consistent with the requirements of" ERISA, we deem Plaintiff's administrative remedies exhausted. *See* 29 C.F.R. § 2560.503-1(l) (2003).

We do not reach Plaintiff's additional arguments as to why exhaustion is not required in this case. Specifically, we do not decide whether, as the district court found, a plan document must explicitly and affirmatively require exhaustion. At minimum, a plan document must detail claims review procedures and remedies and must not mislead an employee into believing that there are no administrative remedies or that those remedies need not be exhausted. Defendant's plan document did just that, which this Court cannot condone. Thus, we will proceed to consider whether the district court properly granted Plaintiff judgment on the record.

## II.      Judgment on the Record
### Standard of Review

In considering a district court's disposition of an ERISA motion for judgment on the record, we review the legal conclusions of the district court and the plan administrator *de novo*.[5] *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). Likewise, we review a plan administrator's factual findings *de novo,* according no deference or presumption of correctness to the administrator's decision, but instead independently "determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002). In conducting this review, courts may look only to the record before the administrator. *Id.* This Court's precedent conflicts as to the standard of review we apply to a district court's factual findings. *See Hutson v. Reliance Std. Life Ins. Co.*, 742 F. App'x 113, 117–18 (6th Cir. 2018). We have found that a *de novo* standard of review applies to the district court's factual determinations. *Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 700 (6th

---

[5]Ordinarily, if a benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a reviewing court may reverse only if the administrator's decision was arbitrary and capricious. *Moos v. Square D Co.*, 72 F.3d 39, 41 (6th Cir. 1995) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). However, the Michigan Administrative Code prohibits insurers issuing, advertising, or delivering insurance contracts in the state from using discretionary clauses. *See* Mich. Admin. Code r. 500.2201–02. This Court has held that ERISA does not preempt these rules. *See Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 609 (6th Cir. 2009). The parties agree that *de novo* review applies, and we apply that standard. (Def. Br. at 21–22; Pl. Br. at 25.)

Cir. 2014) ("[W]e take a 'fresh look' at the administrative record . . . 'accord[ing] no deference or presumption of correctness' to the decisions of either the district court or plan administrator.") (quoting *Hoover*, 290 F.3d at 809). But we have also reviewed a district court's factual findings for clear error. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006). We do not resolve that conflict today because the result would be the same under either standard.

**Analysis**

Defendant cites its plan document's pre-existing conditions limitation as its basis for denying Plaintiff's claim. Plaintiff contends that she was covered under the transfer of insurance coverage provision, and because Defendant did not apply this provision, it erroneously denied her benefits. The district court agreed with Plaintiff and granted her judgment on this basis. Because the facts found below are insufficient to allow us to determine whether Plaintiff is covered under the transfer of insurance provision and the corresponding pre-existing conditions limitation credit, we vacate the district court's judgment and remand for further factfinding.

"Congress intended ERISA plans to 'be uniform in their interpretation and simple in their application.'" *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 934 (6th Cir. 2000) (quoting *McMillan v. Parrott*, 913 F.2d 310, 312 (6th Cir. 1990)). Thus, "[i]n interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of its language, as it would be construed by an ordinary person." *Id.* Where that meaning is unclear, "ambiguous contract provisions in ERISA-governed insurance contracts should be construed against the drafting party." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 n.7 (6th Cir. 1998) (en banc); *see also Guinn v. Gen. Motors, LLC*, 766 F. App'x 331, 335 n.2 (6th Cir. 2019).[6] A term or provision is ambiguous "if it is subject to two reasonable interpretations." *Schachner v. Blue Cross & Blue Shield*, 77 F.3d 889, 893 (6th Cir. 1996).

---

[6]This Court has held that this rule is inapplicable when we apply the arbitrary-and-capricious standard to review the determinations of a plan administrator or fiduciary who has been given "discretionary authority to determine eligibility for benefits or to construe the terms of a plan," pursuant to the Supreme Court's decision in *Firestone*. *See Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 264, 266 (6th Cir. 2018). This is not such a case. The parties agree that *de novo* review applies, and we apply that standard of review. We held in *Clemons* that "when it is not clear whether the administrator has, in fact, been given *Firestone* deference on a particular issue, we think the doctrine still has legitimate force." *Id.* at 266. Likewise, when it is clear that we should not afford an administrator or fiduciary *Firestone* deference, this doctrine applies.

Resolving ambiguities in the insured's favor also accords with ERISA's goals "'to promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits.'" *Firestone*, 489 U.S. at 113 (citations omitted) (first quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983); and then quoting *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)).

### A. Pre-existing Conditions Limitation

The plan document's pre-existing conditions limitation provides that Defendant will not pay benefits for a "Total Disability" caused by, contributed to by, or resulting from "a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of twelve (12) consecutive months from the date he/she became an Insured." (Admin. R., R. 42-1 at PageID #751.) A "Pre-Existing Condition" includes "any Sickness or Injury for which the Insured received medical Treatment, consultation, care or services, . . . or took prescribed drugs or medicines, during the three (3) months immediately prior to the Insured's effective date of Insurance." (*Id.* at #752.)

The facts before us do not permit us to determine if this pre-existing conditions limitation provision applies. Neither Plaintiff nor Defendant contest that Plaintiff's medical condition qualifies as a "Sickness" or "Injury" under these definitions. But Defendant and Plaintiff disagree as to the Plaintiff's effective date of insurance. Defendant contends it was April 7, 2013, the date that Plaintiff returned from her initial medical leave, while Plaintiff contends it was January 1, 2013, the "Effective Date" of the policy. The applicability of the transfer of insurance provision is dispositive as to this issue. (*See* Def. Br. at 32 ("The Transfer of Insurance provision in the Group Policy allows for the individual coverage effective date to coincide with the effective date of the Group Policy").) As will be discussed below, additional factfinding is required to determine whether that provision applies, and so this Court cannot conclusively determine Plaintiff's effective date of insurance.

Moreover, the district court did not make a factual finding as to when Plaintiff began receiving medical treatment for her condition. We do not make such a finding now, as it is more appropriately the province of the district court to address that question on remand. The district court did find that Plaintiff did not work after May 12, 2013, and we agree. (Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID ##1228, 1236.) This was less than twelve consecutive months after either January 1, 2013 or April 7, 2013. Therefore, if the facts on remand show that Plaintiff did receive medical treatment for her condition in the three months prior to her effective date of insurance, as determined based on the applicability of the transfer of insurance provision, Plaintiff would potentially be subject to the pre-existing conditions limitation.

## B. Transfer of Insurance Coverage Provision

Defendant's plan document also includes a "Transfer of Insurance Coverage" provision. Although the plan document does not directly address how this provision interacts with the pre-existing conditions limitation, in accordance with its name, this provision apparently ensures that those covered under the prior policy—subject to some conditions—are also covered under Defendant's policy as of the effective date of the policy. Defendant agrees that "[t]he Transfer of Insurance provision in the Group Policy allows for the individual coverage effective date to coincide with the effective date of the Group Policy." (*See* Def. Br. at 32.) Plaintiff contends that she was covered under this provision.[7] Its relevant portion establishes:

> If an employee was covered under the prior group long term disability insurance plan maintained by you prior to this Policy's Effective Date, but was not Actively at Work due to Injury or Sickness on the Effective Date of this Policy and would otherwise qualify as an Eligible Person, coverage will be allowed under the following conditions:

---

[7]Defendant argues that Plaintiff should not be permitted to raise this argument in this case, as she did not exhaust this issue in an internal appeal. However, this Court has held that a claimant is not required to exhaust her issues "because of the non-adversarial nature of ERISA proceedings." *Liss v. Fidelity Servs. Co.*, 516 F. App'x 468, 474 (6th Cir 2013) (citing *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 632 (9th Cir. 2008) ("The non-adversarial nature of the ERISA proceeding weighs against imposing an issue-exhaustion requirement."); *Sims v. Apfel*, 530 U.S. 103, 110 (2000) ("Where . . . an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker.")). While we are not bound by this decision, we agree with its conclusions, which are also supported by our exhaustion holding.

(1) The employee must have been insured with the prior carrier on the date of the transfer; and

(2) Premiums must be paid; and

(3) Total Disability must begin on or after this Policy's Effective Date.

(Admin. R., R. 42-1 at PageID #742.)

The transfer of insurance provision thus only applies to individuals who meet several conditions. First, the relevant portion of the provision provides that individuals "not Actively at Work due to Injury or Sickness" when the policy became effective on January 1, 2013 are eligible for coverage.[8] (*Id.*; *see also id.* at #729 (indicating effective date of January 1, 2013).) Neither party contends that Plaintiff was actively at work on this date, and we agree with the district court's finding that she was not. (Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID #1233.)

As for whether Plaintiff was out of work due to "Injury" or "Sickness," the document's definitions of those terms both require that the affliction cause "Total Disability which begins while insurance coverage is in effect for the Insured." (Admin. R., R. 42-1 at PageID ##739–40.) This is significant. Although Defendant repeatedly asserts that "a disability insurance policy does not cover an individual already on disability – or not actively at work – just like a life insurance policy does not cover an individual who is already dead," (Def. Br. at 37 n.2; *see also* Def. Reply Br. at 11 n.2 (citing *Sonnichsen v. Principal Life Ins. Co.*, No. 1:12-cv-1232, 2013 U.S. Dist. LEXIS 31559 (E.D. Wis. March 7, 2013))), this provision's terms suggest it *only* applies to those who were out of work because of an affliction that eventually develops into a "Total Disability."[9] Defendant's contention that an employee who left work due to a disability

---

[8]Defendant analogizes to *McKay v. Reliance Standard Life Ins. Co*, No. 1:06-CV-267, 2009 WL 5205375 (E.D. Tenn. Dec. 23, 2009), *aff'd* 428 F. App'x 537 (Jun. 27, 2011), to suggest that the transfer of insurance provision was not applicable to Plaintiff because, like the defendant there, she was not "Actively At Work." 428 F. App'x at 543–45. Defendant's argument is unavailing. For one, *McKay* applied a more generous arbitrary and capricious standard of review to the plan administrator's determination. *Id.* at 540–41. Moreover, Plaintiff does not contend that she is eligible under the clause of the transfer of insurance provision that requires her to have been "Actively At Work" on January 1, 2013, but that she is eligible under the clause that does not require her to have been "Actively At Work."

[9]As applicable to Plaintiff, "Total Disability" means "that as a result of Injury or Sickness":

before the group policy's effective date cannot be covered by this provision is thus contradicted by the plain terms of its provision—such individuals may be covered if their disability began before the policy's effective date, so long as they were not *totally* disabled before that date. Applying the pre-existing condition limitation to exclude these same individuals would be in direct conflict with the apparent point of this provision.

Second, to be covered under the transfer of insurance provision, one must "otherwise qualify as an Eligible Person." (Admin. R., R. 42-1 at PageID #742.) According to the plan document's terms, Plaintiff is an "Eligible Person" if she "meets the Eligibility Requirements of this Policy," which in turn provide that she must be "a member of an Eligible Class" and "ha[ve] completed the Waiting Period." (*Id.* at ##739, 745.) Plaintiff is a member of an "Eligible Class" if she is an "active, Full-time employee" in one of four designated groups of positions: Classes 1, 2, 3, and 4. (*Id.* at #737.) It is uncontested that her position fell within Class 3. It is less clear whether Plaintiff was an "active, Full-time employee," and we are again unable to determine if she was.

The plan document does not define "active," but the definition notably does not require an employee to be "Actively at Work," a term used extensively throughout the document that means "actually performing on a Full-time basis the material duties" of one's position, "not includ[ing] time off as a result of an Injury or Sickness." (*Id.* at #739.) Defendant's failure to use "Actively at Work" suggests that "active" has a different meaning here. That meaning is ambiguous. *See Schachner*, 77 F.3d at 893 (stating that a term or provision is ambiguous "if it is subject to two reasonable interpretations"). "Active" could mean that a party is able and available to work, but not present on that day, as the district court apparently understood it to mean in the context of Hartford's plan. (*See* Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID #1235 n.6 (distinguishing between "Actively at Work" and "Active

---

(1)  during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation; . . .

(2)  after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(Admin. R., R. 42-1 at PageID #740.)

Employee" as defined in Hartford's plan).)  "Active" could also mean non-retired.  *See, e.g.*, *Boggs v. Boggs*, 520 U.S. 833, 839 (1997) (explaining that "ERISA is designed to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years").  As both definitions are reasonable, this Court must interpret the definition in Plaintiff's favor.  *Perez*, 150 F.3d at 557 n.7.  As the district court noted, the record shows that Plaintiff performed work after January 1, 2013.  (Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID ##1228, 1236.)  Therefore, we can conclude that she was an "active" employee in the sense that she was not retired at that point.

"Full-time" is defined to mean "working for [Oakwood] for a minimum of 30 hours during a person's regular work week."  (Admin. R., R. 42-1 at PageID #739.)  Defendant contends that an employee is "Full-time" only if she is "'working' for the policy holder for a minimum of 30 hours."  (Def. Br. at 36 (citing Admin. R., R. 42-1 at PageID #739).)  But this argument ignores the fact that the definition requires thirty hours of work "during a person's regular work week."  (Admin. R., R. 42-1 at PageID #739.)  Defendant analogizes to *Turner v. Safeco Life Ins. Co.*, 17 F.3d 141 (6th Cir. 1994), where this Court suggested that a contract making insurance available to "[a]ll active regular full time employees of the policyholder working a minimum of [thirty] hours a week" was restricted to those "working" now, since the verb was in the present tense.  (Def. Br. at 36–37 (citing *Turner*, 17 F.3d at 143–44).)  But the contract at issue in *Turner* did not modify "working" to include those working the requisite hours in a "regular work week," as is the case here.  Moreover, in *Turner*, this Court did not apply the rule that ambiguous contract provisions are construed against the drafting party, which precedent now suggests we should apply.  *See* 17 F.3d at 144; *Perez*, 150 F.3d at 557 n.7.  This provision could be reasonably interpreted to mean that a person must currently work thirty hours a week, but it could also be reasonably interpreted to mean that a person's job description requires that person to work thirty hours a week.  *See Schachner*, 77 F.3d at 893. In the case of ambiguity, we defer to the latter interpretation.  *See Perez*, 150 F.3d at 557 n.7.  The district court also did not address whether Plaintiff's required work schedule made her a full-time employee, and we leave that factual determination to it on remand.

Plaintiff "has completed the Waiting Period" if she "is continuously employed on a Full-time basis" with Oakwood for 180 days.  (Admin. R., R. 42-1 at PageID ##737, 745.)  There is no question that Plaintiff had been continuously employed with Oakwood for more than 180 days at the time the insurance switched, as she had been employed there since 2005.  (*See id.* at ##768, 824 (noting Plaintiff's employment since 2005); Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID #1228.)  Thus, she had apparently satisfied the waiting period.  Therefore, if the district court finds that Plaintiff was indeed a full-time employee, she would have been an Eligible Person on January 1, 2013 and the transfer of insurance provision would not be inapplicable on this basis.

But Plaintiff must still meet three more explicit conditions to be covered by the transfer provision.  The first requires Plaintiff to "have been insured with the prior carrier [(Hartford)] on the date of the transfer."  (Admin. R., R. 42-1 at PageID #742.)  Plaintiff, Defendant, and the district court look to the language of the Hartford plan document to determine whether Plaintiff was insured.  (Pl. Br. at 38–40; Def. Br. at 32–34; Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID ##1233–35.)  However, the whole of Hartford's plan document is not in the administrative record, and we are not permitted to look outside the administrative record on review.  *Hoover*, 390 F.3d at 809.  Moreover, whether Plaintiff was insured by Hartford on the date of transfer is more appropriately treated as a question of fact, rather than an invitation to construe Hartford's plan document, especially in the absence of the administrative record that Hartford itself would have relied upon to determine coverage.  It is therefore necessary to conduct new factfinding on this point on remand.

As for the second criterion for coverage, Defendant did not argue before the district court that Plaintiff's premiums were unpaid.  (*See* at Def.'s Resp. Pl.'s Mot. J., R. 46 at PageID #1167 ("The facts indicate that Plaintiff fails to satisfy two of the three conditions," including coverage with the prior insurer and "Total Disability" beginning after the "Policy's Effective Date").)  Defendant itself should be able to confirm whether it was paid Plaintiff's premiums, and it implicitly conceded before the district court that Plaintiff's premiums were indeed paid.  The district court accordingly did not address this issue.  Defendant may not now assert that Plaintiff failed to satisfy this criterion, nor may it so argue on remand.  Because this issue was not

contested before the district court in the first instance, it is not preserved for review. *See, e.g.*, *Daft v. Advest, Inc.*, 658 F.3d 583, 594 (6th Cir. 2011); *Hutson*, 742 F. App'x at 119.

Turning to the third criterion, we are also unable to determine whether the "Total Disability" Plaintiff suffered began "on or after this Policy's Effective Date" of January 1, 2013. (Admin. R., R. 42-1 at PageID #742; *id.* at #729 (indicating January 1, 2013 effective date).) As applied to Plaintiff, "Total Disability" means that "during the [180-day] Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation" and "after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation." (*Id.* at ##737, 740.) The district court found that because Plaintiff was able to work between April 7 and May 12, 2013, she clearly could perform her duties as of those dates, and thus was not "Totally Disabled" as of January 1, 2013. (*See* Op. & Order Granting Pl.'s Mot. J. & Den. Def.'s Mot. J., R. 50 at PageID #1236.)[10]

The district court's analysis on this point overlooks two crucial provisions of the plan document. These provisions allow that one may be "Totally Disabled" because of a condition as of a certain date, have a period of recovery thereafter, and then return to a "Totally Disabled" state due to that same condition. Read together, they lay out specific conditions for when two instances of leave related to the same condition will constitute separate "Total Disabilities." First, the "Recurrent Disability" provision establishes that "[i]f, after a period of Total Disability for which benefits are payable, an Insured returns to Active Work for at least six (6) consecutive months, any recurrent Total Disability for the same or related cause will be part of a new period of Total Disability," provided the insured completes a new 180-day elimination period. (Admin. R., R. 42-1 at PageID #748.) But "[i]f an Insured returns to Active Work for less than six (6) months, a recurrent Total Disability for the same or related cause will be a part of the same Total Disability. A new Elimination Period is not required." (*Id.*) When considered alongside

---

[10]Defendant suggests that *McKay* is also controlling on this point. We disagree. As discussed herein, *McKay* applied a more generous arbitrary and capricious standard of review to the plan administrator's determination. 428 F. App'x at 540–41. More importantly, the defendant in *McKay* was found to have been totally disabled prior to the group policy's effective date in large part because he did not work after that date. *Id.* at 545. By contrast, Plaintiff returned to work following January 1, 2013.

the first sentence, it is clear that this latter portion of the provision also applies only when an insured person has completed an initial elimination period and thus had "a period of Total Disability for which benefits are payable." (*See id.*)

The second provision overlooked by the district court applies to employees who do not complete a full elimination period during their first leave, making them ineligible for benefits during that period.  In that case, the plan document provides for an "Interruption Period" for those who, "during the Elimination Period, . . . return[] to Active Work for less than 30 days," in which case "the same or related Total Disability will be treated as continuous."  (*Id.* at #739.) By implication, the converse of this provision is also true—that is, if an employee returns to work for thirty days or more before completing the elimination period, her second period of disability will be considered a new "Total Disability."

To resolve the question of whether Plaintiff met this third criterion, then, it is necessary to determine whether Plaintiff's two leaves created two separate periods of "Total Disability" under the plan document.  Plaintiff returned to work from April 7, 2013 to May 12, 2013.  (*Id.* at ##762, 798.)  This is less than the six-month return required to create a new period of "Total Disability" under the "Recurrent Disability" provision applicable to those who were out on their initial leave through the elimination period.  Still, it is more than the less-than-thirty-day return that means a second period of leave would be treated as part of the same "Total Disability" under the "Interruption Period" provision applicable to those who were not out on leave through the elimination period.

The district court did not make any findings of fact as to whether Plaintiff completed the elimination period during her first leave.  Assuming, without deciding, that Plaintiff's "Total Disability" began on the date that she began her initial leave, the parties have argued two possible dates for the start of her elimination period: October 8, 2012 and October 12, 2012.  If Plaintiff's leave began October 8, she was out of work for 181 days before returning on April 7, 2013 and thus completed the elimination period.  If her leave began October 12, she was out of work for 177 days and did not complete the elimination period.  In the parties' initial pleadings before the district court, Plaintiff contended that she left work on October 8, (Am. Compl., R. 16 at PageID #155), and Defendant argued that she left work October 12, (Def.'s Answer Am.

Compl., R. 38 at PageID #698). On appeal, they switch positions. (Pl. Br. at 39; Def. Br. 11, 29.) Given the conflicting evidence and arguments on this point, we think it appropriate to afford the parties the opportunity to argue this issue on remand.

As to whether the Plaintiff was disabled after departure for her second leave, we partially agree with the district court's finding that she was. The record indicates that Plaintiff was "Totally Disabled" beginning on May 13, 2013 through at least May 27, 2014. The record is replete with evidence of Defendant's disability during this time. Plaintiff's attending physician, Dr. Michaele Oostendorp, D.O., provided a statement indicating that Plaintiff was totally disabled between May 13, 2013 and July 24, 2013. (Admin. R., R. 42-1 at PageID #827.) In July 2013, Dr. Opada Alzohaili attested that Plaintiff had "continued symptoms and possible immune system compromise related to medications" and advised that her medical leave should be continued through October 16, 2013. (*Id.* at ##838–39, 847.) As of a November 13, 2013 appointment, Kristi Tesarz, a physician's assistant working with Dr. Oostendorp, (*id.* at #850), assessed Plaintiff as having tachycardia, asthma, hyperlipidemia, vitamin B-12 and D deficiencies, hypothyroidism, osteopenia, glucocorticoid deficiency, obstructive sleep apnea, anxiety, and shingles, (*id.* at #860.) On January 28, 2014, Dr. Oostendorp reported similar issues and that, due to her medications, Plaintiff was immunosuppressed. (*Id.* at #850.) Oostendorp concluded that Plaintiff's current position "would cause a danger to herself," and that Plaintiff "is unable to work due to her immunosuppressed state." (*Id.*) On May 27, 2014, Kristi Tesarz completed a questionnaire indicating that Plaintiff could not stand, sit, walk, or drive over the course of an eight-hour workday; could not perform simple grasping, pushing or pulling, or fine manipulation; and could not bend, squat, climb, reach above her shoulder, kneel, crawl, use her feet, drive, or carry any significant weight. (*Id.* at #888.) Tesarz indicated that Plaintiff would likely not achieve maximum medical improvement for over sixteen months, the longest time frame she could indicate, through September 27, 2015. (*Id.*)

This evidence demonstrates that Plaintiff was totally disabled in that she "could not perform the material duties of [her] Regular Occupation" from May 13, 2013 through at least May 27, 2014. (*See id.* at #740.) However, the facts before us are again insufficient to allow us to determine that Plaintiff was totally disabled beyond May 27, 2014. Tesarz's attestation that

Plaintiff would be totally disabled through September 27, 2015 is apparently based on projection, rather than actual evidence.  Finding total disability beyond May 27, 2014 on this basis would be error, and further factfinding is therefore also necessary on this issue on remand.

### C.  Pre-Existing Conditions Limitation Credit

Defendant contends that even if Plaintiff is covered under the plan document's transfer of insurance provision, the pre-existing conditions limitation still applies, unless Plaintiff meets the terms of the pre-existing conditions limitation credit.  We agree.  That provision states that "[i]f an employee is an Eligible Person on the Effective Date of this Policy, any time used to satisfy the Pre-existing Conditions Limitation of the prior group long term disability insurance plan will be credited towards the satisfaction of the Pre-existing Conditions Limitation of this Policy." (*Id.* at #742*.*)  Our previous analysis as to whether Plaintiff was an eligible person also applies here.  Thus, the applicability of this provision turns on whether Plaintiff was a full-time employee.  If so, this provision applies, and her time used to satisfy any pre-existing conditions limitation of the Hartford policy should be credited towards the twelve months of work she was required to perform after her effective date of insurance in order to avoid the application of the pre-existing conditions limitation.  (*Id.* at #751 (requiring that Plaintiff be "Actively at Work for one (1) full day following the end of twelve (12) consecutive months from the date he/she became an Insured" for provision not to apply).)  But the district court also made no factual finding as to how much time Plaintiff had earned under Hartford's pre-existing conditions limitation, which required a participant to work for Oakwood for a year before she could avoid its application. (Am. Compl., Ex. 2, R. 16-2 at PageID #187.)  While we note that Plaintiff had been employed with Oakwood continuously during at least two years when Hartford insured the plan, we think it appropriate to allow the district court to consider this question in the first instance. (*Id.* at #176; Admin. R., R. 42-1 at PageID ##768, 824.)

Thus, while we find that Plaintiff may have been covered under the transfer of insurance and pre-existing conditions limitation credit provisions, the facts before us do not permit us to make a definitive finding that she was.  Accordingly, further factfinding is required as to the following points: (1) when Plaintiff began receiving medical treatment for her condition; (2) whether Plaintiff was a full-time employee required to work more than thirty hours during

her regular work week; (3) whether Plaintiff was insured with Hartford as of the date of transfer; (4) whether Plaintiff's initial leave lasted through the elimination period; (5) whether Plaintiff remained totally disabled after May 27, 2014; and (6) what credit Plaintiff had earned under Hartford's pre-existing conditions limitation.  Accordingly, we vacate the district court's judgment on the record and remand for further factfinding on these six questions.  On remand, the district court may make what additional findings of fact it can based on the administrative record, but it may not look beyond the administrative record.  *Hoover*, 390 F.3d at 809.  If the district court remands the case to the plan administrator, in view of the court's familiarity with the record, it may wish to retain jurisdiction over future proceedings should the case subsequently return.  *See, e.g.*, *Bowers v. Sheet Metal Workers' Nat'l Pension Fund*, 365 F.3d 535, 537 (6th Cir. 2004).

## III.    Award of Benefits

### Standard of Review

This Court reviews a district court's determination of a remedy in an ERISA action for abuse of discretion. *Javery*, 741 F.3d at 699.  "[A]n abuse of discretion exists only when the court has the definite and firm conviction the district court made a clear error of judgment in its conclusion upon weighing relevant factors."  *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 376 (6th Cir. 2009) (alteration in original) (quoting *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 529 (6th Cir. 2008)).

### Analysis

For the same reasons that we vacate the district court's grant of judgment on the record to Plaintiff, we vacate its award of benefits.  The district court abused its discretion by granting Plaintiff LTD benefits without conducting further factfinding to ensure that the transfer of insurance provision indeed applied.  It further abused its discretion by calculating Plaintiff's benefits without further conducting factfinding regarding her dates of disability.

**IV.     Award of Attorneys' Fees**

**Standard of Review**

"This Court reviews a district court's decision to award attorney fees in an ERISA action for abuse of discretion." *Shelby County Health Care Corp.*, 581 F.3d at 376. As before, "[a]n abuse of discretion exists only when the court has the definite and firm conviction the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *Id.* (quoting *Gaeth*, 538 F.3d at 529).

**Analysis**

In this opinion, we vacate much of the district court's prior decision as to Plaintiff's eligibility for LTD benefits.  Our decision is not necessarily inconsistent with an award of attorneys' fees. *See Hardt v. Reliance Standard Life Ins. Co*, 560 U.S. 242, 250, 255–56 (2010) (a party need not be the "'prevailing party' to be eligible for an attorney's fees award," but must have achieved "some success on the merits").  However, our determinations on appeal may change the district court's ultimate conclusions as to several of the factors considered in awarding attorneys' fees. *See Sec'y of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985); *see also O'Callaghan v. SPX Corp.*, 442 F. App'x 180, 186 (6th Cir. 2011) (finding the *King* factors still applicable after the Supreme Court's decision in *Hardt*, 560 U.S. at 242).  Accordingly, we think it appropriate to allow the district court to consider that award anew, with this Court's opinion to inform it.

On remand, the district court may find that Plaintiff is still entitled to attorneys' fees. Should it so decide, we do not dispute that it could find that its initial fee award was "reasonable." *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999). "[T]he starting point" for determining what attorneys' fees are reasonable is "a 'lodestar' calculation—the product of the number of hours reasonably spent on the case by an attorney times a reasonable hourly rate." *Moore v. Freeman*, 355 F.3d 558, 565 (6th Cir. 2004).

The district court did not abuse its discretion in determining Plaintiff's counsel's hourly rate here.  Courts look to the "prevailing market rate in the relevant community"—or "that rate which lawyers of comparable skill and experience can reasonably expect to command within the

venue of the court of record"—to determine a reasonable hourly billing rate. *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). The court cited Plaintiff's attorney John Conway's approximately two decades' worth of experience and specialty in employment law, and found that his hourly rate of $395 was reasonable in light of the State Bar of Michigan's findings that the 75th and 95th percentile hourly rates of attorneys at similar levels of experience are between $325 and $475 an hour, and in similar specialties between $380 and $485 an hour. (Op. & Order, R. 69 at PageID #1580 (citing *Economics of Law Practice in Michigan*, State Bar of Mich. 8–9 (2018)).) It also correctly cited a recent fee award in an ERISA action to support its conclusion that a $125 hourly rate for a legal assistant is reasonable. (*Id.* (citing *Leonhardt v. ArvinMeritor, Inc.*, No. 04-72845, 2008 WL 11399537, at *2 (E.D. Mich. Oct. 10, 2008) (collecting cases)).)

The district court's approval of the number of hours Plaintiff's attorneys spent on this case also was not an abuse of discretion. Given the number of filings made in this case, Plaintiff's counsel's total hours were reasonable, and the district court appropriately deducted fees for hours expended to review the administrative record. (*Id.* at ##1580–81.) Likewise, the district court correctly found that block billing is permissible in this Circuit, "provided the description of the work is adequate." (*Id.* at #1581 (citing *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 371 (6th Cir. 2014)).) The district court did not abuse its discretion in finding that Plaintiff's counsel's billing provided sufficient detail regarding the tasks performed. (*See* Supp. Stmt., Ex. 1, R. 64-2 at PageID ##1478–86.) Plaintiff's counsel's records detail the documents they reviewed and drafted, what research they conducted, what conversations they had internally and externally, and other relevant matters. This is sufficient detail. Defendant's reliance on out-of-circuit case law to suggest otherwise is unavailing.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of Defendant's motion to dismiss on the basis of exhaustion. Because further factfinding is necessary to determine whether Plaintiff was eligible for LTD benefits and in what amount, we **VACATE** the district court's grant of judgment on the record to Plaintiff, as well as its award of LTD benefits and attorneys' fees, and **REMAND** for further proceedings consistent with this opinion.

—————————

**CONCURRENCE**

—————————

THAPAR, Circuit Judge, concurring.  It is troubling to have no better reason for a rule of law than that the courts made it up for policy reasons.  Yet that seems to be the case with ERISA's exhaustion requirement.  Federal courts should reconsider when—or even whether—it's legitimate to apply this judge-made doctrine.

Here are some (hopefully uncontroversial) first principles.  Congress, not the judiciary, has the power to "prescribe[] the rules by which the duties and rights of every citizen are to be regulated."  The Federalist No. 78, at 523 (Alexander Hamilton) (J. Cooke ed., 1961).  Congress exercises this power by enacting texts, which become our laws.  Outside of legislation, people can also change their rights and duties by making contracts.  But when courts stray from the texts of these laws or the terms of these contracts, they wield power that is not rightly theirs.

It's hard to square these principles with the ERISA exhaustion doctrine.  Or at the very least, with the way courts talk about the doctrine.  One circuit has described it as "a judicial innovation fashioned with an eye toward 'sound policy.'"  *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 279 (3d Cir. 2007) (quoting *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)).  Another has said it's "a court-imposed, policy-based requirement."  *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003).  But employees' benefit rights should not depend on "a hazy body of policy choices that courts are free to 'discover.'"  *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746 (6th Cir. 2019).  They should just depend on (1) the statute Congress enacted and (2) the plan documents they or their employers agreed to.

We know this not only from first principles but also because Congress said so.  ERISA gives an employee a federal cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  As the text makes triply plain, this kind of claim "stands or falls by 'the terms of the plan.'"  *Kennedy v. Plan Adm'r for DuPont*

*Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009). The statute is the procedural scaffolding, the plan documents the source of substantive rights.

Where does exhaustion enter this picture? The statute itself is "silent" about it. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004). ERISA requires *plans* to offer fair and reasonable internal-review procedures for claims they deny. 29 U.S.C. § 1133(2). But the statute nowhere says *claimants* must take advantage of those procedures as a precondition to enforcing their rights in court.

Even so, the circuit courts have "uniformly" enforced an exhaustion defense. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013). The doctrine got its start back in an era of unabashed purposivism, and the two leading cases show it. They based the exhaustion requirement mainly on policy judgments, legislative-history tea-reading, and an unexplained analogy to the Taft-Hartley Labor Management Relations Act. *See Amato*, 618 F.2d at 566–68; *Taylor v. Bakery & Confectionary Union & Indus. Int'l Welfare Fund*, 455 F. Supp. 816, 819–20 (E.D.N.C. 1978). It should bother us that such a ubiquitous doctrine, one that has thwarted many an employee's efforts to enforce his benefit rights, rests on such shaky foundations. Maybe there are better arguments waiting to be made. But if there are, they've been waiting a long time.

Of course, even if the *statute* doesn't require exhaustion, a plan's documents may require it as a precondition of going to court. But sometimes they don't. Here, for example, the Reliance Policy not only fails to mention an exhaustion requirement but also fails to describe internal-review procedures at all. Reading this policy, it's hard to see what would put an employee on notice that she could lose her benefit rights by failing to appeal the denial of her claim. Where both the statute and the plan documents are silent about any duty to exhaust, we should think twice about whether requiring exhaustion is legitimate.

Because the majority opinion faithfully applies existing law, I join it in full.